UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
MARK DELL,
                       Petitioner,

    -against-
                                               **MEMORANDUM & ORDER**

ROBERT ERCOLE, Superintendent,
  Greenhaven Correctional Facility                  06-CV–1724

                       Respondent.
-----------------------------------------------------------------X
DEARIE, Chief Judge.

      Petitioner Mark Dell petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons that follow, the application is denied and the petition dismissed.

## BACKGROUND

      In April 2002, following a jury trial at which he testified, petitioner was convicted of robbery in the first degree and burglary in the second degree for his role in an armed home invasion in a Brooklyn apartment building. He was sentenced to two seventeen-year terms to be served consecutively. The Appellate Division reduced the sentence to concurrent terms but otherwise unanimously affirmed the conviction. People v. Dell, 11 A.D.2d 631 (2d Dep't 2004). Leave to appeal was denied. People v. Dell, 4 N.Y.3d 762 (2005). Petitioner's co-defendant, Iyatta Warburton, entered a plea of guilty over the prosecution's objection and received a five-year sentence.

      The basic facts of the crime are not in dispute. On the morning of November 6, 2000, as thirteen year-old Corey Mantock was leaving for school, two men hiding near the elevator seized him and forced themselves, along with the boy, back into the boy's home. The men then embarked on a duct-taping spree, binding first the boy's hands, then those of his mother Diana

Mantock, and then the hands and feet of Diana's companion Courtney Hughes. The assailants eventually fled with cash and jewelry, leaving the victims bound. Police were telephoned only when Corey managed to chew the tape off his hands.

The principal issue at trial was identification. Five of the seven claims in the habeas petition involve the pre-trial and trial rulings that bear on that issue.

A.  **Pre-Trial Identification**

Three weeks after the crime, each victim independently identified petitioner from a photographic array. Four weeks after that, on March 21, 2001, lineups were held. Hughes and Diana Mantock identified petitioner, but Corey identified a filler.

At the Wade hearing held in December 2001, the court found no indication of actual suggestiveness in the lineups. But the photographs of the lineup were of questionable quality, and made it "very hard [for the court] to determine" what the participants "actually looked like." H. 33. The court therefore suppressed the lineups and held an independent source hearing as to Hughes and Diana Mantock.

Diana testified that, on the morning of the attack, the two assailants were within six steps of her as she watched them running from the elevator toward her son; their faces were directly in front of hers as they pushed her son into the apartment and ordered them both to the couch. H. 81-82. She stated, "I was watching [petitioner] because he had my son, so I was watching what he was doing to my son." H. 84-85. It was morning, the lamps were on, and the assailants faces were not covered. H. 84-85. On the day of the crime, she had told police that petitioner was wearing a knitted tam hat and earrings, was neither fat nor skinny, and spoke with a Jamaican accent. H. 98-102.

Hughes testified that he was on the sofa, fifteen feet from the door, when the assailants first arrived. Hughes believed that, because the invaders were unmasked, they would likely decide to kill the victims to prevent later identifications. H. 108. Petitioner approached Hughes with a gun, taped his legs and hands, and made him lie on the floor. H. 109. These actions took about two minutes; Hughes stated, "He was, you know, close. He was right in front of me so there's no mistaken identification here." H. 110. When the assailants "were about to tape [his] mouth," Hughes panicked and offered to show them where cash was hidden. H. 111, 114. Petitioner then untaped Hughes's legs, escorted him into the bedroom at gunpoint, and was led to money under the carpet. H. 112, 119-20. On the day of the crime, Hughes had told police that petitioner was "taller than the other guy," and "not dark like the other guy," and that he wore a hooded sweatshirt and a tam hat. H. 114.

The hearing judge asked Hughes whether he was "so scared" that perhaps that fear might "detract" from his memory, and whether the events happened "so long ago" that he might no longer recognize the attackers; Hughes replied: "I know exactly what he looks like" and "I never forget [sic] his face." H. 114-15.

In making its findings, the hearing court considered the opportunity Diana and Hughes had to view the assailants, their degrees of attentiveness, the accuracy of their prior descriptions to police, the level of certainty they displayed at the hearing, and the length of time between the incident and the hearing as required by the federal and state authorities that the court recited. H.134-37 (*citing* Manson v. Brathwaite, 432 U.S. 98 (1977); People v. Neese, 138 A.D.2d 531 (2d Dep't 1988); People v. Androvett, 135 A.D.2d 640 (2d Dep't 1987)). Crediting the testimony of Diana and Hughes on these points, the court concluded that the state had met its

burden of showing that police-initiated procedures "ha[d] not tainted" Diana's or Hughes's "ability to independently identify [petitioner] as the person who committed the crimes" and ruled that each would be allowed to identify petitioner at trial. H. 137.

**B.     Trial Testimony: Diana Mantock and Hughes**

Diana's trial account of the crime was consistent with her hearing testimony, but more detailed. T. 36-43. She testified that she observed petitioner as he (i) removed duct-tape from his pocket, bound her son's hands, and carried the boy into the bedroom; (ii) removed the jewelry she was wearing; (iii) forced her into the bedroom; (iv) duct-taped her feet; (v) wrapped his gun in a sheet and threatened that "nobody [was] coming out alive" unless he got all the money; and (vi) forced Hughes to the floor, struck him with a gun and prepared to tape his mouth. On her capacity to identify petitioner, Diana testified that "there [was] no doubt about it," because "he push[ed] my son in the apartment" at gunpoint "[s]o I won't forget his face." T. 59.

Hughes's trial testimony was consistent with Diana's. T. 106-26. On petitioner's identity, Hughes testified that, "without a doubt," petitioner was one of the two assailants. T. 126. Hughes insisted that he "kn[e]w that's him for sure" and that he "kn[e]w exactly." T. 126.

**C.     The Question of Corey's Testimony**

The possible use of Corey Mantock's lineup misidentification at trial was discussed considerably, with the court voicing its concern that the parties seemed not to have thought the matter through. T.44-45. Before resting, the prosecution declared its intent to call Corey. When the court asked the prosecutor why she "would call a witness in [her] case who has identified somebody else as the perpetrator," she asked to consult her supervisor. T. 221-222. The defense stated, "[i]f they don't want to call him I may ask for a missing witness charge." T. 222.

-4-

Counsel argued that because Corey was one of the victims, jurors would expect him to be a prosecution witness and should, therefore, be permitted to draw the opposite inference from the prosecution's decision not to call him. The court disagreed, remarking that Corey was "not a witness expected to give testimony favorable to the People" and that "[h]e's not missing" but actually present and available to testify. T. 224-27.

The defense then expressed its intention to call Corey. The court ruled that the boy could not be asked about the lineup because the answers would be hearsay, and because the prosecution had not been allowed to use the positive lineup identifications by Diana and Hughes. If the boy identified petitioner, however, he could be impeached with his lineup selection. The defense argued that petitioner's constitutional right to present a defense was being infringed. T. 274-77.

When called by the defense, Corey could not identify petitioner as one of the assailants. He testified that "it was kind of a long time ago, so I'm not a hundred percent sure." T. 282. Asked to try again, Corey stated, "I can't take a guess." T. 282.

### D.     The Defense Case: Petitioner's Alibi

Petitioner testified that he was home sleeping on the morning of the crime, that his mother woke him, and that he was with her until leaving her at a subway station. T. 308-313. Petitioner admitted that he used as many as four different aliases. Petitioner's mother also testified, confirming her son's account of his alibi that morning. T. 289-305.

### E.     The Palm Print Evidence and Disbanding of First Jury

During jury selection on January 11, 2002, the prosecutor announced that she had just received word that a print found on duct tape recovered from the Mantock apartment matched petitioner's left palm. The defense moved to preclude the evidence as untimely. The prosecutor

explained that her office did not learn until late December 2001, when she was assigned the case, that petitioner's palm prints had been taken nine months earlier (on the day of the lineups), and that she had then acted promptly to have the print tested.

The court rejected the defense request to preclude and accepted the prosecution's proposal, which the defense joined, to disband the jury and adjourn the case to allow both sides time to analyze the print. The court noted that jeopardy had not yet attached because only five jurors had been selected.

During the adjourned trial six weeks later, the palm print evidence was admitted. One officer testified about the nine-month delay between the taking and testing of the print, and another admitted that his colleague's action was "not appropriate" police procedure. The defense did not call a print expert, but petitioner testified that the left-handed print in evidence could not be his because he recalled that only his right hand was printed. Petitioner also declared his willingness to be re-printed.[1]  T. 340-41.

---

[1] When his attorney declined to redirect, petitioner stated, "I'm not finished testifying." T. 316. The court ordered a recess so petitioner and his counsel could confer, after which counsel told the court that his client wished to continue testifying but did not furnish him with particulars. Counsel advised the court, however, that he "ha[d] an idea of what he's going to testify to" and that it was "against [his] advice." T. 317. Outside the presence of the jury, petitioner complained to the court that he did not testify before the grand jury, that he believed the indictment was fake, and that police had mistreated him. The court advised petitioner that he had a right to take the stand but that if he had more to say to the jury he must first tell his lawyer, who would pose the proper questions. T. 317. The court also threatened to hold petitioner in contempt if he did not cease in his efforts to shout out from counsel table. After another recess and the charging conference, defense counsel told the court that his client persisted in his wish to return to the stand to address several matters against counsel's advice. The court allowed petitioner to testify only in response to a narrow set of questions concerning the print evidence.

# DISCUSSION[2]

## A. The Independent Source Findings

Petitioner challenges the independent source findings of the hearing court and claims he was denied a fair trial because Diana and Hughes were allowed to make in-court identifications.

The Appellate Division found that the hearing court "properly declined to suppress the in-court identification of [petitioner] by two of the victims" because "the testimony at an independent source hearing established that the victims had multiple opportunities to observe the defendant at close range for a lengthy period of time during the commission of the crime." People v. Dell, 11 A.D.3d at 632. For habeas purposes, the hearing court's findings are "presumed to be correct." 28 U.S.C. § 2254(e)(1).

Petitioner sifts the record to identify *de minimis* discrepancies in the testimony and to suggest alternative interpretations of certain witness remarks, but does little to disturb the presumptive correctness of the hearing court's findings. For the same reasons, petitioner has not shown that the Appellate Division's affirmance of those findings is contrary to or an unreasonable application of Supreme Court law, or an unreasonable application of the facts, within the meaning of 28 U.S.C. § 2254(d)(1) and (d)(2). To the contrary, the record reveals that the hearing court exercised considerable caution in the first instance by suppressing the lineup identifications absent any indication of suggestiveness, and by then proceeding to hold an independent source hearing. The court also took an active role in ascertaining possible impediments to the victim's capacity to recall, considered the wide range of circumstances that

---

[2] Respondent does not challenge exhaustion, and the record confirms that each of the claims petitioner raises here was briefed before the Appellate Division.

factor into independent-source analysis, and marshaled the evidence comprehensively.

B.      **Evidentiary Rulings at the Independent Source Hearing**

In a separate claim, petitioner contends that the court improperly curtailed the cross-examination of Hughes and Diana on the subject of the lineup, their prior description of petitioner, and their descriptions of the other assailant. The Appellate Division denied this claim summarily as one of petitioner's "remaining contentions" found to be "without merit." People v. Dell, 11 A.D.3d at 633. This "silent" adjudication is entitled to full AEDPA deference. Jiminez v. Walker, 458 F.3d 130, 145 (2d Cir. 2006).

Petitioner has not shown the state court decision to be contrary to or an unreasonable application of Supreme Court law, or an unreasonable application of the facts. See 28 U.S.C. § 2254(d). Indeed, the Court finds petitioner's contentions here to be largely frivolous: questions about the lineup were immaterial because the lineup identifications were ultimately suppressed; counsel *did* fully explore (and the hearing court did consider in its decision) the victims' earlier descriptions of petitioner; and descriptions of the assailant were not material because petitioner's misidentification defense did *not* suggest that the victims had confused him with the co-assailant.

C.      **The Missing Witness Claim**

Petitioner claims that the trial court's refusal to give a missing witness charge denied him a fair trial. The Appellate Division found this claim unpreserved for appellate review because, "[a]lthough the defense counsel asserted that he *might request* such a charge, the record indicates that he never requested that charge." People v. Dell, 11 A.D.3d at 632 (emphasis added). The court rejected the claim on the merits in any event, reasoning that "the witness (Corey) was made available to the defense and, in fact, testified as part of the defendant's case that he could not

identify the defendant as one of the perpetrators of the crime." Id.

Respondent correctly interprets the Appellate Division's decision as resting on an independent and adequate state law ground, which creates a procedural bar not removed by the alternative ruling on the merits. See Harris v. Reed, 489 U.S. 255 (1989). As the Supreme Court explained, the independent and adequate state law doctrine "curtails reconsideration of the federal issue on federal habeas as long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision," and when it does, "a state court need not fear reaching the merits of a federal claim in an *alternative* holding." Harris, 489 U.S. at 264 n. 10 (emphasis in original).

Arguably, the state law ground relied upon is not independent and adequate. Counsel understandably sought to address the scope of Corey's possible testimony before the prosecution rested and, notwithstanding his use of the conditional "may," unequivocally advocated that the charge was appropriate under the circumstances, thereby preserving the issue. See N.Y. Criminal Procedure Law § 470.05[2] (requires, *inter alia*, that a "protest" be "registered," and further provides that "a party who without success has either expressly *or impliedly sought or requested* a particular ruling or instruction, is deemed to have thereby protested the court's . . . failure to rule or instruct . . . sufficiently to raise a question of law" (emphasis added). Surely defense counsel did as much here. See Cotto v. Herbert, 331 F.3d 217, 240 (2d Cir. 2003) (internal citation omitted) (state procedural bar not necessarily "adequate" where defense counsel "'substantially complied' with the rule given 'the realities of trial'").

In any case, the claim lacks merit. The Supreme Court has explained that, "if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the

transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable." Graves v. United States, 150 U.S. 118, 121 (1893). Although jurors might ordinarily expect testimony from all three victims to be part of a prosecution's case, the decision not to call Corey was not a "missing-witness" trigger because Corey was not "peculiarly within" the prosecution's control. As the trial court emphasized when declining to give the charge, Corey was not "missing," but present and available to testify. See, e.g. United States v. Adeniji, 31 F.3d 58, 65 (2d Cir. 1994) (where the witness is "equally available to both parties," missing witness instruction "is inappropriate"); United States v. Eberhart, 467 F.3d 659, 665 (7th Cir 2006) (refusal to give missing witness instruction not error because defense acknowledged that it could have called the witness but chose not to).[3]

Furthermore, even if a missing witness charge were appropriate, neither Graves, nor any other Supreme Court case, *requires* that it be given. See Reyes v. Miller, 2005 WL 3576841 at *4 (E.D.N.Y. Dec. 29, 2005) ("[t]he Supreme Court did not articulate a constitutional right to a missing witness charge in *Graves*, . . . nor has it ever done so"); Morales v. Strack, 2003 WL 2181693 at *4 (E.D.N.Y. July 3, 2003) ("no clearly established Supreme Court precedent requiring a trial court to instruct the jury with respect to a missing witness"). Instead, whether to give a missing witness charge is committed to "the sound discretion of the trial court." Reid v. Senkowski, 961 F.2d 374, 377 (2d Cir. 1992). The discretionary decision not to give the instruction does not support habeas relief unless failure to do so, "by itself so infected the entire trial that the resulting conviction violates due process." Cupp v. Naughten, 414 U.S. 141, 147

---

[3] The Second Circuit has discussed the possibility of what some jurists refer to as the "un*called* witness" charge as an option when a witness is equally available to both sides. See United States v. Caccia, 122 F.3d 136, 139 (2d Cir. 1997).

(1973). Given the availability of Corey to the defense, the trial court's refusal to give a missing witness instruction was not an abuse of discretion, much less a deprivation of due process. As the Appellate Division observed, because Corey did testify and failed to identify petitioner, "[i]t cannot be said that [petitioner] would have obtained a greater benefit had the jury been permitted to consider the adverse inference contained in the missing witness charge." 11 A.D.3d at 632. Cf. Reyes, 2005 WL 3576841at *5 (denying a missing witness claim on habeas, noting that, because defendant was allowed to emphasize the witness's absence during his closing arguments, there was no prejudice).

**D.    Corey's Misidentification**

Petitioner claims the trial court's refusal to allow Corey to be asked about his line-up misidentification denied him a fair trial and his constitutional right to present his complete defense. The Appellate Division rejected this claim on the merits, finding that, "[s]ince [petitioner] successfully moved to suppress evidence of the pretrial lineup and the witness involved did not identify [petitioner] in court, it was not error for the Supreme Court to preclude the defendant from eliciting testimony regarding the witness's misidentification of a filler at the lineup." People v. Dell, 11 A.D. 3d at 632. This ruling is entitled to full AEDPA deference. See 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 409 (2000).

The Appellate Division's decision is not contrary to or an unreasonable application of Supreme Court law. To be sure, the right to present a defense is one of the "minimum essentials of a fair trial." Chambers v. Mississippi, 410 U.S. 284, 294 (1973). See also Crane v. Kentucky, 476 U.S. 683, 690 (1986) (recognizing that "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense'") (internal citations omitted). But

Corey's inability to make an in-court identification amply advanced petitioner's defense of misidentification, and petitioner never sought to argue that the individual Corey identified at the lineup was the actual assailant. In addition, petitioner himself took the stand and claimed he was not the assailant—indeed, offering an alibi which his mother corroborated—and was allowed to return to the stand to seek to offer the jury a basis for rejecting the palm print evidence. The jury's rejection of petitioner's testimony and his claim of misidentification should not be misread as any unconstitutional impairment, by the state court, of his opportunity to present that theory.

In any event, any arguable error here was harmless in light of the overwhelming evidence of guilt, notably, the positive identifications made by the two adult victims whose identifications were amply scrutinized pre-trial. See Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (harmless error standard on habeas is whether alleged error had a "substantial and injurious effect or influence in determining the jury's verdict"). Cf. Phan v. Greiner, 165 F. Supp. 2d 385 (E.D.N.Y. 2001) (granting habeas on other grounds, finds that trial court's refusal to allow defense to elicit that witness had failed to identify defendant at lineup "was erroneous" but "not sufficiently prejudicial to justify setting aside the judgment of conviction because [the witness] did not identify petitioner as the shooter at the trial").

### E. The Confrontation Clause Claim

Petitioner claims that out-of-court statements implicating him, made by his co-defendant Iyatta Warburton, who did not testify, and Warburton's mother Olive Davey, who also did not testify, were indirectly admitted through Officer Mattei in violation of his Sixth Amendment right of confrontation. Petitioner invokes not only the general principles of Crawford v. Washington, 541 U.S. 36 (2004) and Bruton v. United States, 391 U.S. 123 (1968), but also

relies in particular on Mason v. Scully, 16 F.3d 38 (2d Cir. 1994), where the Second Circuit held that police testimony that merely *implies* that a non-testifying witness implicated the defendant can violate the Confrontation Clause.

The challenged testimony is Mattei's account of his recovery of the two rings stolen from Diana Mantock. Mattei disclosed that he obtained the rings from Olive Davey, whom he identified to the jury as "the mother of another individual that [he] arrested in regards [sic] to this case." T.191. The prosecutor then asked Mattei "how [was] it" that he recovered the rings from Ms. Davey and the defense objected, but the court allowed the question. Mattei's response was, "After I conducted an interview with another individual that I arrested in regards to this case I called Mrs. Davey. I asked her to check—." T. 191. The defense then renewed its objection, which the court sustained. The court also ordered Mattei's entire answer stricken. (No special instruction was given to jury at that time, but the court's general instructions at the close of the case reminded jurors not to consider stricken testimony.) The prosecutor then asked Mattei whether, after recovering the rings, "it [was] fair to say that [he] had only made one arrest at that point." T. 192. The defense objected, the court sustained the objection, and Mattei did not respond.

The prosecutor also referred to this portion of Mattei's testimony during summation, arguing to the jury as follows: "And remember, there was a second person arrested in this case. His name is Iyatta Warburton. You heard testimony from Officer Mattei, who recalled to you the conversation or the fact that he had a conversation with Iyatta Warburton's mother, that she came down to the precinct after the conversation and handed Officer Mattei these rings." T. 364-65.

There is no obvious Bruton or Crawford issue because Officer Mattei was not asked to

disclose what Warburton or Warburton's mother told him. But petitioner understandably questions this exchange in light of Mason, particular because identification was the central issue at trial. Nonetheless, the record shows that the trial court adequately protected petitioner's rights by sustaining counsel's timely objections to arguably improper questions in all but one instance. On the one occasion where perhaps the nature of the non-speaking objection was not perceived until Mattei delivered his response (in which he referred to an "interview" with "another arrested individual"), the court sustained the timely renewed objection and struck the inadmissible testimony. Unlike in Mason, therefore, it cannot be said here that "the clear implication" of the police testimony was that the defendant was implicated by a co-defendant. 16 F.3d at 42-43. Thus, the Court concludes that the Appellate Division did not act contrary to or unreasonably apply Crawford or Bruton, even read through the lens of Mason.[4]

Even if some of the prosecutor's questions crossed the Bruton or Crawford line, petitioner is not entitled to habeas relief on the basis of this claim because any possible Bruton or Crawford error was harmless. See United States v. McClain, 377 F.3d 219, 222 (2d Cir. 2004) (even post-Crawford, Confrontation Clause errors subject to harmless error review). In light of the jurors' opportunity to assess petitioner on the stand, as well as the in-court identifications of petitioner made by Diana and Hughes (whose opportunity and capacity to observe their attackers were amply scrutinized pre-trial), the challenged portions of Mattei's testimony could not have had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637.

---

[4] The Appellate Division denied this claim on the merits as one of petitioner's "remaining contentions" found to be "without merit." People v. Dell, 11 A.D.3d at 633, and that "silent" adjudication is entitled to full AEDPA deference. Jiminez, 458 F.3d at 145.

F.  **The Granting of the Mistrial Motion**

Petitioner argues that the trial court essentially forgave the state for an unjustified nine-month delay between the obtaining and the testing of his palm print, and unfairly enhanced the state's opportunity to convict him by adjourning the first trial instead of simply precluding the print evidence. The Appellate Division's silent rejection of this claim (as one of the "remaining claims" found to be "without merit") is entitled to AEDPA deference. Jimenez, 458 F.3d at 145.

Although petitioner's position is somewhat understandable, elaborate "fair trial" or "due process" analysis not required, for the resolution of the claim lies in the facts, which show unequivocally that no constitutional deprivation occurred: 1) petitioner's counsel joined in the state's request for a mistrial and there is no explicit or implied ineffectiveness claim launched against counsel for that decision; 2) the adjournment afforded the defense ample opportunity to assess the print as well and, if it wished, retain its own print expert, which it declined to do; 3) the state's delay in processing the print was fully brought out to the jury, with one officer even admitting that proper procedures were not followed; and 4) the trial court accommodated petitioner in his desire to return to the stand, after his examination was complete, to offer testimony disputing the print.

In any event, the Court concludes that, in light of the positive identifications made by the two adult victims and the opportunity the jurors had to assess petitioner's own credibility on the stand, the admission of the palm print evidence did not have a "substantial and injurious effect" on the jury's verdict. Brecht v. Abrahamson, 507 U.S. at 637.

G.  **The Prosecutorial Misconduct Claim**

Petitioner's final claim is that the prosecutor committed misconduct in her opening

statement and summation by improperly appealing to the jury's sympathies, by making misleading comments about Corey's failure to make an identification, and by injecting her personal beliefs about the strength of her case and the weakness of the defense.  Passages by petitioner highlights include the prosecutor's argument that the Mantock family "lived out everyone's worst nightmare . . . harm coming to your child and criminals invading your home" and that "[t]he nightmare had a name, [petitioner], " T. 15-16; and from the summation, the prosecutor's discussion of the "courage" that the "thirteen year old displayed when he rushed out of there after chewing his way out of the duct-tape like a dog." T. 360-61.  Also cited as prosecutorial error are the arguments, during summation, (i) that despite his failure to make an identification, Corey "didn't say it wasn't" petitioner, T. 361; (ii) that "it was painfully apparent that [petitioner's] mother was not telling you the truth," T. 367; (iii) that petitioner "is the master of deception" and should not be believed, T. 370; (iv) that petitioner "made mistakes" by choosing victims "that have ingrained [his] face in their memories" T. 357, 59; and (v) that, "I submit to you ladies and gentlemen . . . would you forget [petitioner]"? T. 359.

The Appellate Division's rejection of this claim on the merits as another of petitioner's "remaining claims" found to be "without merit," People v. Dell, 11 A.D.3d at 633, is not contrary to or an unreasonable application of Supreme Court law.  Prosecutorial remarks, even if "undesirable" or "universally condemned," do not amount to constitutional error unless they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (internal quotation marks and citations omitted).  The due process analysis requires attention to "the severity of the misconduct[,] the measures adopted to cure the misconduct[,] and the certainty of conviction absent the improper

statements." Floyd v. Meachum, 907 F.2d 347, 355 (2d Cir. 1990) (quoting United States v. Modica, 663 F.2d 1173, 1181 (2d Cir. 1981)).

Here, none of the challenged remarks was outside the bounds of zealous argument, much less the kind of "egregious misconduct," Donnelly, 416 U.S. at 647 (1974), generally required to give rise to a constitutional claim. In any event, any conceivable prejudice was cured by the trial court's instructions, which reminded the jurors that it was their duty alone to determine credibility without "passion, prejudice, or sympathy for anyone," and that they were not obligated to accept any of the arguments that the attorneys made in summation. T. 378-79.

## CONCLUSION

For the foregoing reasons, the application for a writ of habeas corpus is denied and the petition is dismissed. Because petitioner has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), a certificate of appealability shall not issue. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith. Coppedge v. United States, 369 U.S. 438 (1962). The Clerk of the Court is directed to close this case.

SO ORDERED.

Dated: Brooklyn, New York
March 06, 2009

s/ Judge Raymond J. Dearie
_____
RAYMOND J. DEARIE
United States District Judge